UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARIA J. RENZI,

                              Plaintiff,

          -against-                                        6:19-CV-1133 (LEK/ML)

ONEIDA COUNTY,

                              Defendant.

_____

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

        Plaintiff Maria J. Renzi brought this action against defendant Oneida County alleging

civil rights violations under Title VII of the Civil Rights Act and the Age Discrimination in

Employment Act of 1967 ("ADEA"). Dkt. No. 1 ("Complaint"). Presently before the Court is

Defendant's motion for summary judgment. Dkt. Nos. 23 ("Motion"), 23-8 ("Defendant's

Statement of Material Facts"), 23-15 ("Defendant's Memorandum of Law"), 30 ("Opposition"),

30-2 ("Plaintiff's Response to Defendant's Statement of Material Facts"), 33 ("Reply"). For the

following reasons, the Court grants Defendant's Motion.

**II.    BACKGROUND**

     **A. Factual History**

        The following facts are undisputed, except where otherwise noted.

        Plaintiff began working as a part-time Special Deputy for Oneida County on January 15,

1992 before she became a full-time Correction Officer ("CO") for Oneida County on September

24, 1992. Def.'s SMF ¶¶ 2–3, Pl.'s Resp. to Def.'s SMF ¶¶ 2–3. According to Defendant,

Plaintiff voluntarily resigned from her position on December 24, 1999 to attend college, and then

she was rehired on a part-time basis in February 2000. Def.'s SMF ¶¶ 4–7. Although Plaintiff

does not dispute that she submitted a resignation letter, she claims Sheriff Daniel Middaugh

stated that the Commissioner of Personnel confirmed her return to full-time within 1 year would

not be a break in service. Pl.'s Resp. to Def.'s SMF ¶ 4.1. In any case, Plaintiff returned in

February 2000 and her last day of service was June 19, 2019. See Dkt. Nos. 23-10 ("Renzi

Deposition") at 42:2–42:11 and 30-7.

       *1. Plaintiff's Work*

       Up until 2007, Plaintiff was working line duty. Renzi Dep. at 22:5–22:13. Line duty

consists primarily of working inside the jail with inmates, running daily routines and ensuring

security. Def.'s SMF ¶ 47; Pl.'s Resp. to Def.'s SMF ¶ 47. Plaintiff worked exclusively on

transport duty from 2007 through her retirement in 2019, except for a six-month period in 2018

when she was suspended from transport duties.[1] Def.'s SMF ¶ 49; Pl.'s Resp. to Def.'s SMF ¶

49. Transport duty consists primarily of transporting inmates from the jail to another location,

often the courthouse. Def.'s SMF ¶ 48; Pl.'s Resp. to Def.'s SMF ¶ 48. Defendant contends that

COs primarily work either line or transport duty, but Plaintiff asserts that COs primarily work

line duty. Def.'s SMF ¶ 46; Pl.'s Resp. to Def.'s SMF ¶ 46. Plaintiff was a union member and

even served as a union representative. Def.'s SMF ¶¶ 19–20; Pl.'s Resp. to Def.'s SMF ¶¶ 19–20.

       According to Defendant and Plaintiff's own deposition, Plaintiff's pay and benefits were

not reduced from 2017 through her retirement in 2019. Def.'s SMF ¶ 50; Renzi Dep. at

17:3–17:9. Plaintiff, however, contends that her pay was "severely affected following being

removed from transports in 2018." Pl.'s Resp. to Def.'s SMF ¶ 50.1. In her deposition, Plaintiff

---

      [1]  The suspension will be discussed below. See infra II(A)(5).

notes that she did make less money while on line duty because overtime was not as readily available. Renzi Dep. at 18:13–25. Furthermore, she contends that could not bring herself to stay for overtime duties to supplement her earnings. Pl.'s Resp. to Def.'s SMF ¶ 50.2.

### 2. Defendant's Structure

Oneida County's correctional facility is led by the Chief Deputy of the Correction Division ("Chief"), who reports to the Oneida County Undersheriff and Sheriff. Def.'s SMF ¶ 63.[2] Oneida County has two Captains that report directly to the Chief: one oversees operations and the other manages administrative duties. Def.'s SMF ¶ 64; Pl.'s Resp. to Def.'s SMF ¶ 64. The Lieutenants directly supervise COs and the Lieutenants directly report to a Captain. Def.'s SMF ¶ 65; Pl.'s Resp. to Def.'s SMF ¶ 65.

Robert Maciol is 52 years old and works as the Oneida County Sheriff, a position he has held since January 2011. Def.'s SMF ¶ 99.[3] Robert Swenszkowski is 48 years old and was the Oneida County Undersheriff from January 2011 until he retired on August 30, 2018. Def.'s SMF ¶ 100. Joe Lisi is 63 years old and works as the Oneida County Undersheriff, a position he has held since August 30, 2018. Def.'s SMF ¶ 101. Greg Pflieger is 52 years old and was the Chief

---

[2] Although Plaintiff could not affirm nor deny this paragraph, Pl.'s Resp. to Def.'s SMF ¶ 63, the Court will deem that it is admitted. See L.R. 56.1(b) ("The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original); see also Universal Calvary Church v. City of New York, No. 96-CV-4606, 2000 WL 1538019, at *2 n.6 (S.D.N.Y. Oct. 17, 2000) (admitting a statement after opposing party set forth that "Plaintiff can neither admit nor deny this statement based upon the factual record").

[3] For paragraphs 99 to 102, Plaintiff could not affirm nor deny these paragraphs, Pl.'s Resp. to Def.'s SMF ¶¶ 99–102, and like above, the Court will deem these paragraphs as admitted. See supra n.2.

3

Deputy of the Correction Division for Oneida County from December 2015 until he retired on August 30, 2019. Def.'s SMF ¶ 102.

Captain Lisa Zurek was Administrative Captain, but had very little interaction with Plaintiff and did not have input on Plaintiff's awards which were managed by the Undersheriff. Def.'s SMF ¶ 66; Pl.'s Resp. to Def.'s SMF ¶ 66. Zurek is a female and 54 years old. See Dkt. No. 23-6 at ¶ 4.  Plaintiff's supervisor since 2008 was Lieutenant Ken Shanley. Def.'s SMF ¶ 180. Defendant claims that Shanley was her direct supervisor, but Plaintiff argues that Shanley was her immediate supervisor. Id.; Pl.'s Resp to Def.'s SMF ¶ 180.

### 3.  Time in Service Awards

In 2012, Plaintiff complained to Chief Gabriel Liddy that she did not receive a 20-year time in service award. Def.'s SMF ¶ 26; Pl.'s Resp. to Def.'s SMF ¶ 26. These service awards are only in the form of a certificate and are not monetary awards. See, e.g., Dkt. Nos. 30-13 and 30-14. All COs receive a service award for each five-year period. Def.'s SMF ¶ 141; Pl.'s Resp. to Def.'s SMF ¶ 141. Plaintiff did receive a 10-year service award in 2010 or 2011 and a 15-year service award in 2015. Def.'s SMF ¶¶ 34–35; Pl.'s Resp. to Def.'s SMF ¶¶ 34.1, 35. After Plaintiff received the 15-year award, she and Undersehriff Swenszkowski discussed service award eligibility. Def.'s SMF ¶ 144; Pl.'s Resp. to Def.'s SMF ¶¶ 144.1–144.4. In 2017, Plaintiff did not receive her 25-year certificate.[4] Id. ¶ 203.4. Defendant contends that it was because of her break in service between December 1999 and February 2000, which Plaintiff disagrees with.

---

[4]  Besides contending that the 25-year award is a "particularly important and coveted award," Pl.'s Resp. to Def.'s SMF ¶ 203.7, Plaintiff does not provide any additional information on why the 25-year award is more important than other awards such as the 20-year or 15-year award.

Def.'s SMF ¶ 203; Pl.'s Resp. to Def.'s SMF ¶ 203.1. Plaintiff was in contact with management several times since December 2017 attempting to get the department to recognize her time in service. See Dkt. No. 30-10.

### 4. Plaintiff's Other Awards

On January 13, 2017, Plaintiff and her partner, Bill Balsamico, assisted a police officer being attacked on the side of the road. Def.'s SMF ¶¶ 37–38; Pl.'s Resp. to Def.'s SMF ¶¶ 37–38. Plaintiff and Balsamico were both awarded a Meritorious Service Medal at a public awards ceremony on December 3, 2018. Def.'s SMF ¶¶ 37, 39–40; Pl.'s Resp. to Def.'s SMF ¶¶ 37, 39–40. At the same awards ceremony, Plaintiff also received a Presidential Detail Citation, but Plaintiff contends that the certificates were handed out in bulk to transport officers. Def.'s SMF ¶ 36; Pl.'s Resp. to Def.'s SMF ¶ 36.1. The awards Plaintiff received were noted in a subsequent news article published by a local newspaper. Def.'s SMF ¶ 42; Pl.'s Resp. to Def.'s SMF ¶ 42. Plaintiff and Balsamico were also publicly recognized at the Rome Wesleyan Church 12th Annual Law Enforcement Ceremony in July 2018 for their efforts in assisting the police officer. Def.'s SMF ¶ 43; Pl.'s Resp. to Def.'s SMF ¶ 43.

### 5. Removal from Transport Duty and Remedial Training

Both parties agree that from 2017 to 2019, 20 male officers and 4 female officers were assigned to transport duty. Def.'s SMF ¶ 72; Pl.'s Resp. to Def.'s SMF ¶ 72. Plaintiff also asserts that from 2007 to 2014, she was the only female officer assigned to transport duty. Pl.'s Resp. to Def.'s SMF ¶ 72.1.

In 2018, Plaintiff and her partner, CO Bray, were removed from transport duty. Renzi Dep. at 70:12–70:15; 70:19–21. On January 22, 2018, Oneida County issued a Notice of

Investigation ("NOI") to Plaintiff and CO Bray. Def.'s SMF ¶ 159; Pl.'s Resp. to Def.'s SMF ¶ 159. The NOI issued to CO Bray alleged that he allowed a female inmate into the courthouse vestibule with male inmates in violation of County policy. Def.'s SMF ¶ 161; Pl.'s Resp. to Def.'s SMF ¶ 161. The NOI issued to Plaintiff alleged that she too allowed a female inmate into the vestibule with male inmates, and that she also stood at the door with her back to the inmates in the vestibule. Def.'s SMF ¶ 162; Pl.'s Resp. to Def.'s SMF ¶ 162. On March 6, 2018, Plaintiff received a Notice of Discipline ("NOD") prepared by Chief Pflieger and issued by Undersheriff Swenszkowski, detailing its findings and proposing a penalty in the form of a six month removal from transport duty. See Dkt. No. 23-11, Ex. Y. Plaintiff's disciplinary hearing was also on March 6, 2018; Undersheriff Swenszkowski, Plaintiff, her union's president and attorney were present, but Captain Zurek was not. Def.'s SMF ¶ 168; Pl.'s Resp. to Def.'s SMF ¶ 168. According to Plaintiff, after both she and CO Bray were removed from transport duty pending the investigation, Captain Zurek called Plaintiff a "prima donna." Renzi Dep. at 68:6–68:19; 70:15–18. Although Plaintiff never personally heard Captain Zurek refer to her as a "prima donna," Zurek referenced her as a "prima donna" to other supervisors. Id. at 68:11–68:12; 71:2–71:5. Defendant does not dispute that "prima donna" was used, but contends that Captain Zurek colloquially referred to the entire transport team, which was comprised mostly of men, as "prima donnas" because they had more amenities and an easier job than other COs. Def.'s SMF ¶ 73. In her deposition, Captain Zurek admitted that she may have called Plaintiff a prima donna. Dkt. No. 30-5 ("Zurek Deposition") at 23:6–23:10. Finally, Defendant contends that Captain Zurek did not make the decision to remove Plaintiff from transport duties, nor did she try to influence any decision-makers regarding the issue. Def.'s SMF ¶ 86. Plaintiff, on the other hand,

6

contends that the Maciol Administration removed Plaintiff from transport duty, and Zurek delivered the order to Shanley. Pl.'s Resp. to Def.'s SMF ¶¶ 86.1–86.2.

Plaintiff was eventually removed from transport duty for six months, but CO Bray was removed for only six weeks. Def.'s SMF ¶ 175; Pl.'s Resp. to Def.'s SMF ¶ 175. Undersheriff Swenszkowski determined that Plaintiff's misconduct was demonstrably worse than CO Bray's. Def.'s SMF ¶ 173.[5] Plaintiff, with the assistance of her union attorney and a union representative, decided not to pursue arbitration on this issue. Renzi Dep. at 177:5–178:9. Plaintiff chose not to arbitrate the issue because she would be off transport duty until the conclusion of the arbitration decision. Id. at 177:1–177:4; Pl.'s Resp. to Def.'s SMF ¶ 174.2. Plaintiff asserts that CO Bray was treated more favorably than her because he received lesser discipline for the transport issue in January 2018. Def.'s SMF ¶ 158; Pl.'s Resp. to Def's SMF ¶ 158.

Because Plaintiff and CO Bray were on line duty again, Captain Zurek required them both to undergo remedial training. Def.'s SMF ¶¶ 92–93; Pl.'s Resp. to Def's SMF ¶ 93. According to Plaintiff, Zurek pulled her from working a tower post after being there for over two hours, referred to her as a liability, and said that she can no longer work a tower until she had done remedial training in the towers. Id. ¶ 95.1. Plaintiff did not believe that she needed remedial training and apparently CO Bray was not required to undergo remedial training in the towers. Id. ¶ 95.3. Plaintiff states she did not receive remedial training, but this training decision affected Plaintiff's ability to take "Tower overtime." Id. ¶¶ 95.5–95.6.

----

[5] Plaintiff could not affirm nor deny this paragraph, Pl.'s Resp. to Def.'s SMF ¶ 173, and like above, the Court will deem that it is admitted. See supra n.2.

### 6. Sick Leave Documentation

In 2016, according to Defendant, Plaintiff received a memorandum requiring her to produce a sick note. Def.'s SMF ¶ 81. Plaintiff admits that there was a memorandum, but asserts that she was never required to provide a doctor's note unless she was out for 3 consecutive days. Pl.'s Resp. to Def's SMF ¶¶ 81.1, 81.4.

Two years later, in 2018, Lieutenant Carollo told Plaintiff she needed to produce a doctor's note for any sick leave absences. Def.'s SMF ¶ 83; Pl.'s Resp. to Def's SMF ¶ 83. Although Plaintiff did not have any concerns with how Lieutenant Carollo treated her and did not know who gave the directive that she must produce a doctor's note for sick leave in 2018, Plaintiff speculates it may have been Captain Zurek, the Undersheriff, or the Sheriff. Def.'s SMF ¶¶ 84–85; Pl.'s Resp. to Def's SMF ¶¶ 84–85.

### 7. Zurek Directive

In August 2018, Captain Zurek directed that all transport officers, except four individuals, would be eligible to work line post as appropriate when there were not enough transports to assign all officers transport work. Def.'s SMF ¶ 152; Pl.'s Resp. to Def's SMF ¶ 152. Plaintiff was not one of these four officers, and Plaintiff asked Lieutenant Shanley to inquire with Captain Zurek as to why she was not excluded from this directive. Def.'s SMF ¶ 154; Pl.'s Resp. to Def's SMF ¶ 154. The four officers were all male. Pl.'s Resp. To Def's SMF ¶ 154.1. Lieutenant Shanley spoke with Captain Zurek, who then withdrew[6] the directive. Def.'s SMF ¶¶ 155–56;

---

[6] Plaintiff further adds that instead of including Plaintiff, Captain Zurek "changed the directive to include everyone." Pl.'s Resp. to Def's SMF ¶ 156.1. Whether Zurek "withdrew" or "changed" the directive is not a dispute over a material fact because Plaintiff admitted in her deposition that Lieutenant Shanley rotated COs the way he always did after the directive was "withdrawn" or "changed." Renzi Dep. at 94:6–94:23.

Pl.'s Resp. to Def's SMF ¶¶ 155–56. Defendant contends that the withdrawn directive had no impact on Plaintiff who continued working transport duties before and after the withdrawn directive, Def.'s SMF ¶ 157, but Plaintiff counters that the four male officers were upset with her for inquiring and the refusal to include Plaintiff caused her undue stress and ridicule from her teammates, Pl.'s Resp. to Def's SMF ¶¶ 157.1–157.2.

### 8. *Vaping Incident*

On January 31, 2019, a smoke alarm was activated in a men's bathroom at the Oneida County Courthouse forcing evacuation of the building. Def.'s SMF ¶ 186.[7] An investigation revealed video where Plaintiff, a known smoker/vaper, was the only person in the men's bathroom at the time the smoke alarm activated. Def.'s SMF ¶ 187. Since smoking and vaping in the courthouse is a crime, the Oneida County Sheriff's Office investigated the matter. Def.'s SMF ¶ 189. The investigators could not conclusively determine whether the alarm was set off by vaping. Def.'s SMF ¶ 190; Pl.'s Resp. to Def's SMF ¶ 190. On March 12, 2019, an investigator issued a NOI to Plaintiff. Def.'s SMF ¶ 191; Pl.'s Resp. to Def's SMF ¶ 191.1. On May 24, 2019, Chief Pflieger issued a document to Plaintiff specifying disciplinary charges and his proposed discipline of Plaintiff for setting off the smoke alarm. Def.'s SMF ¶ 192; Pl.'s Resp. to Def's SMF ¶ 192. Undersheriff Lisi held a disciplinary hearing on June 6, 2019 that was attended by Plaintiff, Chief Pflieger, Plaintiff's Union President, a union representative, and a union attorney.

---

[7] For paragraphs 186, 187, and 189, Plaintiff could not affirm nor deny these paragraphs, Pl.'s Resp. to Def.'s SMF ¶¶ 186–87, 89, and like above, the Court will deem these paragraphs as admitted. See supra n.2.

Def.'s SMF ¶ 193; Pl.'s Resp. to Def's SMF ¶ 193[8]. Captain Zurek was not directly or indirectly involved with the disciplinary hearing or decision-making process for the 2019 vaping incident. Def.'s SMF ¶ 194; Pl.'s Resp. to Def's SMF ¶ 194.[9] The disciplinary hearing did not resolve the matter, and Plaintiff could continue doing transport duties while the matter remained open. Def.'s SMF ¶ 195; Pl.'s Resp. to Def's SMF ¶¶ 195, 195.5. Plaintiff subsequently demanded arbitration of the issue on June 6, 2019. Def.'s SMF ¶ 196; Pl.'s Resp. to Def's SMF ¶ 196. Later that same day, Plaintiff provided a written letter indicating she would retire on June 19, 2019. Def.'s SMF ¶ 197; Pl.'s Resp. to Def's SMF ¶ 197. No one told Plaintiff to retire nor was she facing termination. Renzi Dep. at 211:14–18; 211:22–212:1. Instead, Plaintiff stated she needed to go for her mental health and general well-being. Id. at 211:18–211:21.

Plaintiff was not aware of any male employees being charged with setting off a smoke alarm at work by vaping or smoking. Def.'s SMF ¶ 198; Pl.'s Resp. to Def's SMF ¶ 198. Furthermore, Chief Pflieger and Undersheriff Lisi have not had another CO accused of vaping or smoking at the County Courthouse and setting off the fire alarm. Def.'s SMF ¶ 199.[10]

### 9. EEOC Complaint

On June 7, 2019, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging age and sex discrimination. Def.'s

---

[8] Plaintiff mistakenly refers to paragraph 180 in her admission. Pl.'s Resp. to Def's SMF ¶ 193.

[9] Plaintiff could not affirm nor deny this paragraph, Pl.'s Resp. to Def's SMF ¶ 194, and like above, the Court will deem that it is admitted. See supra n.2.

[10] Plaintiff could not affirm nor deny this paragraph, Pl.'s Resp. to Def's SMF ¶ 199, and like above, the Court will deem that it is admitted. See supra n.2.

SMF ¶ 52; Pl.'s Resp. to Def's SMF ¶ 52. The EEOC issued Plaintiff a letter determination dated June 14, 2019. Def.'s SMF ¶ 96; Pl.'s Resp. to Def's SMF ¶ 96. The letter determination stated that Plaintiff was "unable to establish that there was a connection between the fact that you are a female over age 40, and the alleged harm that occurred to you/being subjected to different terms and conditions of employment and being subjected to an investigation." Def.'s SMF ¶ 97; Pl.'s Resp. to Def's SMF ¶ 97. It also found that there was "no supportive evidence to establish that you suffered a tangible harm because of your age or gender." Def.'s SMF ¶ 98; Pl.'s Resp. to Def's SMF ¶ 98. Plaintiff contends that the EEOC did not conduct a bona fide investigation into her allegations. Id. ¶ 98.1.

**B. Procedural History**

Plaintiff commenced this action on June 12, 2019. Compl. Defendant answered the Complaint on October 23, 2019. See Dkt. No. 8. The parties completed discovery on December 1, 2020. See Dkt. No. 20. Defendant filed its motion for summary judgment on January 15, 2021, Motion. Plaintiff responded on March 11, 2021, Opposition, and Defendant filed a reply on March 25, 2021. Reply.

**III.  LEGAL STANDARD**

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude

11

summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.   DISCUSSION

### A.  Disparate Treatment

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The ADEA similarly makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "The class protected by this statutory prohibition is limited to persons 40 years of age or older." Woodman v. WWOR–TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (citing 29 U.S.C. § 631). ADEA claims are analyzed "under the same framework as claims brought pursuant to Title VII." Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (internal citation omitted).

In an employment discrimination action, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–10 (1993). In order to establish a prima facie case of age discrimination, Plaintiff must demonstrate "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Woodman, 411 F.3d at 76.

If the plaintiff makes out a prima facie case, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). "If such a reason is provided, [the] plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the

presumption, that the employer's determination was in fact the result of [unlawful] discrimination." Id.

Defendant first argues that Plaintiff fails to make out a prima facie case of discrimination because she did not satisfy the third and fourth elements, and even if she did establish a prima facie case, there is no evidence of discriminatory intent. Def.'s Mem. of Law at 15–28.

### 1. Primae Facie Case

#### a. Adverse Employment Action

An adverse employment action is a "materially adverse change in the terms, privileges, duration and conditions of employment." Zavala v. Cornell Univ., 9 F. Supp. 3d 213, 218 (N.D.N.Y. 2014) (Kahn, J.) (quoting Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002). Adverse employment actions may include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Patrolmen's Benevolent Ass'n v. City of New York, 310 F.3d 43, 51 (2d Cir.2002) (alteration in original and quotation marks omitted). A change in the terms and conditions of employment is not materially adverse unless it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Sanders v. N.Y.C. Human Rights Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)).

*i. Initial Removal from Transportation Duty*[11]

"[R]eassignment of job duties is not automatically actionable." Burlington N. & Santa Fe

Ry. Co. v. White, 548 U.S. 53, 71 (2006). "Changes in assignments or responsibilities that do not

'radically change' the nature of work are not typically adverse employment actions." Potash v.

Fla. Union Free Sch. Dist., 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013). Rather, the question of

"whether a reassignment of job duties 'is materially adverse depends upon the circumstances of

the particular case.'" Lewis v. N.Y.C. Transit Auth., 12 F. Supp. 3d 418, 450 (E.D.N.Y. 2014)

(quoting Burlington N., 548 U.S. at 71); see also Smith v. City of New York, 385 F. Supp. 3d

323, 336 (S.D.N.Y. 2019) ("A Plaintiff's subjective dissatisfaction with the work assigned,

absent some evidence that the assignment materially worsened Plaintiff's working conditions, is

insufficient to make out an adverse employment action.") (quotation marks omitted).

Since 2007, Plaintiff was assigned to transport duties. Def.'s SMF ¶ 49. Plaintiff and her

partner were suspended from transport duty as a result of the vestibule incident. Def.'s SMF ¶ 71.

Defendant argues that Plaintiff did not experience a loss of pay, benefits, seniority, or a

demotion. Def.'s Mem. of Law at 17. Furthermore, "[t]emporarily requiring Plaintiff to work her

primary job duty is not an adverse employment action." Reply at 4. In her Statement of Material

Facts, Plaintiff says that her pay was severely affected because she could not bring herself to stay

for overtime duties as the removal impacted her emotional state. Pl.'s Resp. to Def's SMF ¶¶

---

[11] The Courts construes Plaintiff's removal from transport duty as three separate actions
that should be analyzed separately: (1) the removal pending an investigation; (2) the issuance of
the NODs; and (3) the corresponding discipline which resulted in her six-month removal from
transportation duties.

50.1–50.2. Moreover, in her deposition, Plaintiff explains that line duty overtime was not as readily available. Renzi Dep. at 18:13–16.

Neither of Plaintiff's arguments are persuasive. First, "[a]n employee who turns down overtime . . . has not been subjected [to an] adverse action." Rock v. Blaine, No. 14-CV-1421, 2018 WL 1415202, at *12 (N.D.N.Y. Mar. 20, 2018). Second, the denial of overtime opportunities may constitute an adverse employment action if Plaintiff "produced evidence that [s]he incurred an actual loss in income because of lost overtime." Little v. NBC, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002). However, besides conclusory deposition testimony about overtime opportunities, Plaintiff has not produced objective evidence that she had an actual loss of income because of lost overtime opportunities. See Monroe v. City of Danbury, No. 09-CV-2132, 2014 WL 3943632, at *6 (D. Conn. August 11, 2014) ("With regard to the contention that flexible hours provides an opportunity for increased income by virtue of more overtime hours and more job opportunities, the Court finds that Monroe has provided only conclusory statements and hearsay in support of his claims. . . This testimony does not constitute objective evidence of material disadvantage that could demonstrate . . . an adverse employment action."). To potentially succeed on this argument, Plaintiff would need to produce some evidence that there were indeed fewerovertime opportunities available to her.

Despite all this, the Court still finds that Plaintiff's removal from transport duties was an adverse employment action. Defendant admits, through Captain Zurek's deposition, that the transport team "had more amenities and an easier job than other Correction Officers." Def.'s SMF ¶ 73. Thus, there is sufficient objective evidence that Plaintiff's removal from transport duty was materially disadvantageous to her because transport duty was less arduous and

"objectively considered a better job." See Burlington N., 548 U.S. at 71 ("[T]he jury had before it considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that the forklift operator position was objectively considered a better job.") (emphasis added).

*ii. Remedial Training*

"[C]ourts typically find that requiring an employee to attend training is not considered an adverse employment action." Brown v. CSX Transp. Inc., 155 F. Supp. 3d 265, 271 (W.D.N.Y. 2016) (emphasis in original); see also Burns v. City of Utica, 590 F. App'x. 44, 49 (2d Cir. 2014) ("Finally, the fact that Burns was required to undergo remedial training after missing so much work was not an adverse action.").

According to Plaintiff, the training decision affected her ability to take overtime. Pl.'s Resp. to Def's SMF ¶ 95.6. Once again, there is no objective evidence to support this conclusory statement. See Xue Ming Wang v. Abumi Sushi, Inc., 262 F. Supp. 3d 81, 92 (S.D.N.Y. 2017) ("A party may not rely on 'conclusory allegations or unsubstantiated speculation' on summary judgment.") (citation omitted). To potentially succeed on this argument, there needs to be some evidence that there were indeed overtime opportunities available to her, but she was not able to take them because of the remedial training.

Without anything more, the Court sees no reason to deviate from the general notion "that requiring an employee to attend training is not considered an adverse employment action." Thus, the order of remedial training was not an adverse employment action.

### iii.  Disciplinary Treatment

Plaintiff asserts that CO Bray was treated more favorably than her because he allegedly received lesser discipline for the transport issue in January 2018. Def.'s SMF ¶ 158; Pl.'s Resp. to Def's SMF ¶ 158. Because the Court found the initial removal was an adverse employment action, the six month removal from transport duties also constitutes an adverse employment action.

### iv.  Doctor's Note for Sick Time

"The law is well settled that 'requiring [a] Plaintiff to supply medical documentation for sick leave is not an adverse employment action where Plaintiff has not alleged that [s]he was prevented from using h[er] sick leave or that h[er] terms of employment were altered because of the documentation requirement." Neita v. Precision Pipeline Sols., No. 15-CV-0649, 2018 WL 3151699, at *17 (E.D.N.Y. Feb. 26, 2018) (collecting cases). Plaintiff has not shown that she was prevented from using her sick time nor her terms of employment were modified because of the new documentation requirement. Thus, this does not constitute an adverse employment action.

### v.  Zurek Directive

Once more, "[c]hanges in assignments or responsibilities that do not 'radically change' the nature of work are not typically adverse employment actions." Potash, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013). Captain Zurek issued the directive in August 2018, but withdrew it afterwards.[12] Plaintiff needs to demonstrate that the directive materially worsened Plaintiff's

---

[12]  The record does not clearly show how long the directive was actually in place. Plaintiff notes in her deposition that she received word "over a weekend" that Captain Zurek's directive was now to rotate everybody. Renzi Dep. at 93:23–94:7. The duration of the directive does not impact the analysis in this case.

working conditions. Cf. Smith, 385 F. Supp. 3d at 336 (S.D.N.Y. 2019) ("A Plaintiff's subjective dissatisfaction with the work assigned, absent some evidence that the assignment materially worsened Plaintiff's working conditions, is insufficient to make out an adverse employment action.") (quotation marks omitted). Plaintiff admitted in her deposition that Lieutenant Shanley rotated COs the way he always did after the directive was withdrawn. Renzi Dep. at 94:6–94:23. The only harm Plaintiff points to are vague suggestions that some colleagues were upset with her, and she faced undue stress and ridicule from her teammates, Pl.'s Resp. to Def's SMF ¶¶ 157.1–157.2. This is clearly not enough to establish that the directive was an adverse employment action. See Williams v. City of N.Y., No. 99-CV-2697, 2006 WL 2668211, at *23 (E.D.N.Y. Sep. 11, 2006) ("it is well-established that ostracism and impolite behavior by supervisors or co-workers does not constitute an adverse employment action.").

### vi.  Failure to Receive Service Awards and Recognition

The Court understands Plaintiff's frustration at not being recognized at her place of employment for the accurate number of years of service. However, such frustration does not transform the lack of recognition into an adverse employment action. The service awards are given to all COs for each five-year period. Def.'s SMF ¶ 141; Pl.'s Resp. to Def.'s SMF ¶ 141. Assuming that Plaintiff was entitled to them, Plaintiff did not allege or argue that these were monetary awards, and the Court's review of the record indicates that they were indeed non-monetary. "Not receiving an award of this kind, moreover, does not even amount to a 'mere inconvenience' or 'an alteration of job responsibilities,' which themselves are not sufficiently disruptive to constitute an adverse action." Hodges v. Sessions, No. 17-CV-4273, 2018 WL 4232918, at *4 (S.D.N.Y. Sept. 5, 2018). Although Plaintiff claims that the 25-year award was

particularly important, that subjective belief is not enough. See Ortiz v. Metro. Transportation Auth., No. 13-CV-1033, 2014 WL 11460929, at *10 (S.D.N.Y. Sept. 30, 2014), ("However, since Plaintiff has provided no other evidence, aside from her subjective belief, that this particular award actually carried with it the possibility of material enhancement to a MTAPD police officer's resume, I do not find that the denial of this award is an adverse employment action."), aff'd sub nom. Ortiz v. Metro. Transp. Auth., 615 F. App'x 702 (2d Cir. 2015); see also Malloy v. Pompeo, No. 18-CV-4756, 2020 WL 5603793, at *16 (S.D.N.Y. Sept. 18, 2020) ("The failure to give an employee an award–by itself–does not constitute an adverse employment action."). Additionally, Defendant's delay or failure in recognizing Plaintiff for her heroic acts also does not constitute an adverse employment action "because the concrete harm in either case is being deprived of an award." Id. "Indeed, courts have rejected the notion that the failure to nominate an employee for an award can constitute an adverse employment action." Id.

### vii.  Notices of Discipline

Next, the Court analyzes the issuance of the Notices of Discipline ("NOD"). Here, the record evidence reveals that Plaintiff was issued an NOD on March 6, 2018 in regards to the vestibule incident and Plaintiff received a "Waiver of Formal Disciplinary Proceedings" on May 24, 2019 in regards to the vaping incident.[13] See Dkt. No. 23-11, Exs. Y, AA. For purposes of this motion, the Court will assume that Plaintiff has established that the NOD issuances were adverse employment actions.

---

[13]  For purposes of the analysis, the Court will assume that this is no different from a NOD.

### viii. *Constructive Discharge*

It is well settled that "[a]n adverse employment action may also take the form of a constructive discharge." Caskey v. Cty. of Ontario, 560 F. App'x 57, 59 (2d Cir. 2014); see also Adams v. Festival Fun Parks, LLC, 560 F. App'x 47, 49 (2d Cir. 2014) (same); Giambattista v. Am. Airlines, Inc., 5 F. Supp. 3d 284, 292 (E.D.N.Y. 2014) (same). A constructive discharge occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 88 (2d Cir. 2007) (internal quotation marks omitted). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Serricchio v. Wachovia Sec. LLC, 658 F.3d 169, 185 (2d Cir. 2011). Furthermore, "[a]n employee is also constructively discharged where she resigns in the face of inevitable termination." Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 310 (N.D.N.Y. 2013) (Kahn, J.). In this District, this means "that to demonstrate constructive discharge, [a] plaintiff must demonstrate harassment that is more severe and pervasive than that required to show a hostile work environment." Ternullo v. Reno, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998) (citing Christopher-Ketchum v. Agway Energy Prods., 988 F. Supp. 610 (N.D.N.Y. 1997)). "[C]ourts have [also] found that when there were alternative dispute resolution channels that the plaintiffs did not avail at all, it did not make sense to find that employees were 'forced' to resign." Walsh v. Scarsdale Union Free Sch. Dist., 375 F. Supp. 3d 467, 492 (S.D.N.Y. 2019) (collecting cases and emphasis in original).

Here, Plaintiff admitted that she was not facing termination. Renzi Dep. at 211:22–212:1. Furthermore, Plaintiff demanded arbitration regarding the vaping incident and the very same day,

Plaintiff announced her retirement. Def.'s SMF ¶¶ 196–97. There is no evidence in the record to indicate that Plaintiff's union would not arbitrate the issue or Plaintiff reasonably understood that she could not rely on the union. See Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 182 (E.D.N.Y. 2013) (finding adverse employment action where despite the availability of a grievance procedure under a collective bargaining agreement, "Plaintiff was advised by his Union Advisor that he should resign or risk 'irreparable' damage to his reputation."); see also Rupert v. City of Rochester, Dep't of Env't Servs., 701 F. Supp. 2d 430, 441 (W.D.N.Y. 2010) ("Rupert has adduced sufficient evidence to raise a triable issue of fact that a reasonable person in his position would have felt compelled to retire rather than to seek arbitration . . . [when he] understood the statement by his [union] representative that '[t]hey were done[;][t]his was what I got' to amount to a refusal to arbitrate."); see also Walsh, 375 F. Supp. 3d at 492 ("It belies logic to hold that the mere existence of unviable forms of dispute resolution preclude the possibility of constructive discharge. Here, the record does not reflect that Plaintiff ignored the grievance procedure, but rather that he attempted to speak with his Union Representative and did not receive any support.") (emphasis in original). In fact, the record does reflect that the grievance procedure was tenable since Plaintiff was successful in at least one arbitration. Pl.'s Resp. to Def's SMF ¶¶ 28.2–28.4. Under these circumstances, a reasonable jury could not find that Plaintiff was compelled to retire, and thus, Plaintiff has not provided sufficient evidence to create a material issue of fact as to whether she suffered an adverse employment action.

Thus, the only adverse employment actions are as follows: (1) the removal from transport duties pending an investigation; (2) discipline in the form of the six month removal from transport duties; (3) the issuance of NODs.

b.  Inference of Discrimination

"[T]he question of whether the plaintiff has met h[er] prima facie burden of

demonstrating an inference of discrimination is often indistinguishable from the question of

whether the employer's actions served merely as a pretext for some disguised discriminatory

animus towards the plaintiff." Jimenez v. Donahoe, No. 10-CV-3289, 968 F. Supp. 2d 609, 618,

2013 WL 4836718, at *6 (S.D.N.Y. Sept. 11, 2013). Thus, "[d]espite the elaborate process set up

in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that

a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas

analysis." Idrees v. City of New York, No. 04-CV-2197, 2009 WL 142107, at *9 (S.D.N.Y. Jan.

21, 2009) (citing cases). This is because a plaintiff who can prevail at the third stage of the

McDonnell Douglas process has necessarily demonstrated circumstances giving rise to an

inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on

her claim whether or not there exist circumstances giving rise to an inference of discrimination.

To avoid redundancy, the Court will therefore assume Plaintiff has demonstrated an inference of

discrimination and move on to the second and third stages of the McDonnell Douglas analysis.

See Morris v. Ales Grp. USA, Inc., No. 04-CV-8239, 2007 WL 1893729, at *7 (S.D.N.Y. June

29, 2007).

2.  Articulated Non-Discriminatory Reason

Defendant has proffered the same non-discriminatory reason for each of the adverse

actions at issue: Plaintiff was disciplined for her misconduct. Def.'s Mem. of Law at 24; cf.

Aguirre v. New York State Police, 156 F. Supp. 2d 305, 321 (S.D.N.Y. 2001) ("Misconduct is a

23

legitimate non-discriminatory ground for termination."). The burden therefore shifts to Plaintiff

to demonstrate that these reasons were pretext for discrimination.

### 3. Pretext

#### a. Initial Removal from Transportation Duties

The vestibule incident occurred on January 17, 2018. See Dkt. Nos. 23-11, Ex. Y.

Plaintiff and CO Bray were both removed after a week or so, pending the investigation. Id. It is

not clear who exactly made the decision to remove Plaintiff from her transport duties. Both

parties agree that it was not Captain Zurek, Def.'s SMF ¶ 86; Pl.'s Resp. to Def.'s SMF ¶ 86, but

Plaintiff claims that the Maciol Administration removed her and Zurek delivered the order. Id. ¶¶

86.1–86.2. Furthermore, Plaintiff claims Captain Zurek told Lieutenant Shanley to "take them

both off transports, Bray and your prima donna, Maria." Renzi Dep. at 15–18. Other supervisors

heard the "prima donna" comment and were "busting [Plaintiff's] chops, so to speak, about it."

Id. at 71:4–71:5. Additionally, Plaintiff argues that Captain Zurek targeted her. Opp. at 18.

The Court must analyze whether the "prima donna" comments are strong evidence of

pretext. The Second Circuit has outlined four factors that a court should consider in determining

whether remarks are indicative of discriminatory intent or simply "stray:"

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a
> low-level co-worker); (2) when the remark was made in relation to
> the employment decision at issue; (3) the content of the remark (i.e.,
> whether a reasonable juror could view the remark as discriminatory);
> and (4) the context in which the remark was made (i.e., whether it
> was related to the decision-making process) . . . [N]one of these
> factors should be regarded as dispositive . . . .

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149–50 (2d Cir. 2010).

The four factors do not uniformly point in either direction. The first factor is a close call: Zurek was a supervisor, but she was not the one who made the decision to remove Plaintiff. Instead, she just "delivered" the decision. The second factor appears to support an inference of discriminatory intent since it was made contemporaneously. As to the third factor, this too is a close call. On the one hand, "prima donna" is a vague term that could apply to either sex, but there is also the literal translation, which can be viewed as discriminatory. Finally, the fourth factor is not conclusive. If Captain Zurek was a decision-maker, then it would favor Plaintiff; however, if not, then technically the comment was made after the decision-making process.

Assuming Captain Zurek was indeed a decision-maker, the Court is mindful that there is "[a] well-recognized inference against discrimination . . . where the person who participated in the allegedly adverse decision is also a member of the same protected class." Drummond v. IPC Int'l, Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005); see also Graves v. Deutsche Bank Sec., Inc., No. 07-CV-5471, 2012 WL 6097712, at *5 (S.D.N.Y. Nov. 30, 2012), aff'd, 548 F. App'x 654 (2d Cir. 2013) (claim of pretext for discrimination is "strongly undercut" where the decision maker of the adverse employment action decided was, himself, a member of the same protected class). Whatever claim of pretext based on the "prima donna" comments is strongly undermined by the fact that Plaintiff and Captain Zurek were both females and over forty years old. Additionally, any claim that Captain Zurek targeted Plaintiff is also strongly undermined by the inference against discrimination. Finally, it is worth noting that both CO Bray and Captain Zurek were removed from transport duties pending the investigation. Therefore, the Court is not convinced that Plaintiff "produce[d] sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely

than not the employee's age [or gender] was the real reason for the [action]." <u>Graves</u>, 2012 WL 6097712, at *5 (citation omitted).

### b.  Six Month Removal from Transport Duties

The crux of Plaintiff's argument regarding this removal is that she was punished for six months while CO Bray was punished for six weeks. "To establish pretext by showing how comparable employees were treated, the comparable employees must be similarly situated 'in all material respects,' which means that 'a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards . . . [and] that similarly situated employees who went undisciplined engaged in comparable conduct.'" <u>Shah v. James P. Purcell Assocs., Inc.</u>, No. 05-CV-0306, 2007 WL 1630311, at *5 (D. Conn. June 4, 2007) (quotations altered and citations omitted). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000). Defendant argues that the conduct for which CO Bray was disciplined was not comparable to Plaintiff's conduct. Def.'s Mem. of Law at 24. The Court agrees.

The record reveals that unlike CO Bray, Plaintiff was disciplined for six months because she engaged in <u>additional</u> misconduct. Def.'s SMF ¶ 173.[14] Accordingly, Plaintiff has failed to demonstrate a triable issue of fact as to whether CO Bray and Plaintiff were disciplined for comparable conduct. Plaintiff next brings up more comparator evidence in the form of male

---

[14]  <u>See supra</u> n.5. This material fact that Plaintiff's misconduct was demonstrably worse is "deemed admitted for the purpose of assessing whether [Defendant's] motion for summary judgment should be granted or denied." <u>LaFever v. Clarke</u>, No. 3:17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021).

officers being treated more favorably for more concerning conduct, Opp. at 8, but this too fails because there was no evidence that the male officers were similarly situated. Finally Plaintiff generally claims that Captain Zurek targeted her, id. at 18, but this is weakened by the fact that Captain Zurek was not present at the disciplinary hearing nor was there record evidence that Captain Zurek was involved in the decision-making process on whether Plaintiff or CO Bray should be disciplined or the appropriate level of discipline. Def.'s SMF ¶¶ 166–67; Pl.'s Resp. to Def.'s SMF ¶¶ 166–67.[15] Without anything more, Plaintiff has not met her burden under the McDonell Douglas framework as to her discrimination claim relating to the six month removal.

### c.  Issuance of NODs

Any reliance on the issuance of the NODs also does not establish pretext. The 2018 NOD in relation to the vestibule incident and the 2019 NOD in relation to the vaping incident fail for the same reason: there is no comparator or any other indication to establish pretext. Specifically, and similar to the analysis above, the issuance of the 2018 NOD was not prepared by Zurek and the conduct was not comparable to CO Bray's. As for the 2019 NOD, in addition to the fact that Captain Zurek was not directly or indirectly involved with the disciplinary hearing or decision-making process for the 2019 vaping incident, Def.'s SMF ¶ 194; Pl.'s Resp. to Def's SMF ¶ 194, Defendant correctly points out that no other employee besides Plaintiff was implicated, Def.'s Mem. of Law at 27–28. Furthermore, at this point, the "prima donna"

---

[15]  In addition to providing the blanket statement that she "can neither affirm nor deny Defendant's Statement of Material Facts" for paragraph 167, Plaintiff provided that she had to submit her response to the NOI to Captain Zurek. Still, the Court deems this as admitted because Plaintiff did not specifically controvert paragraph 167. See supra n.2

comment is far removed and definitely the type of stray remark that is not sufficient to defeat summary judgment.

Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's Title VII and ADEA discrimination claims.

### B. Retaliation

To make out a prima facie case of retaliation, whether under the ADEA or Title VII, a plaintiff must allege that (1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action. Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012); see also Wheeler v. Bank of New York Mellon, 256 F. Supp. 3d 205, 220 (N.D.N.Y. 2017) (Kahn, J.) ("The Court analyzes retaliation claims under the ADEA using the same 'burden-shifting' formula from Title VII employment discrimination claims.") (citations omitted). Once a plaintiff establishes a prima facie case, the burden shifts to the "employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). "Finally, if the defendant carries his burden[,] 'the presumption of retaliation dissipates' and the plaintiff must demonstrate that the legitimate reason offered is mere pretext for retaliation." Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 238–39 (N.D.N.Y. 2010) (quoting Hicks v. Baines, 593 F.3d 159, 164–65 (2d Cir. 2010)); see also Pompey-Howard v. New York State Educ. Dep't, 275 F. Supp. 3d 356, 366 (N.D.N.Y. 2017) (Kahn, J.).

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because all four elements are missing. See Def.'s Mem. of Law at 28–30. Furthermore, Defendant claims

that there is no evidence of pretext to support the retaliation claim. Id. at 30–31. "Despite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 199 (E.D.N.Y. 2009) (citing cases). However, it is useful to go through the analysis, especially whether there was a materially adverse action when it came to Plaintiff's failure to receive her service awards and recognition. For the other actions, the Court will skip to the final step.

### 1. Prima Facie Case - Adverse Action

Retaliation is actionable only where it amounts to a materially adverse action—an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68 (quotation marks omitted). This is a similar, albeit "lesser standard" than the adverse-employment-action standard applicable to discrimination claims and discussed supra. Evarts v. S. New Eng. Tel. Co., No. 00-CV-1124, 2006 WL 2864716, at *10 (D. Conn. Oct. 2, 2006). At the same time, the Supreme Court has said that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N., 548 U.S. at 67; see also Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007) ("Actionable retaliation claims are limited to those where an employer causes 'material adversity,' not 'trivial harms.'") (citing Burlington N., 548 U.S. at 68). Even though it is a "lesser standard," this Court agrees with other courts that have held that in the Title VII retaliation context, "[t]he failure to be nominated for and to receive an award alone is

29

not enough to be considered materially adverse." Allen v. Napolitano, 774 F. Supp. 2d 186, 201 (D.D.C. 2011) (collecting cases). Thus, when considered individually or when considered as a whole, Plaintiffs fails to establish a prima facie retaliation case based on Defendant's alleged failure to give her the non-monetary service awards and recognition for her heroic efforts.

### 2. *Pretext*

Defendant has provided legitimate, nondiscriminatory reasons for its actions. For the initial removal from transport duties, the associated NOD, and corresponding six month removal, defendant asserts it was disciplining Plaintiff for her misconduct. Def.'s Mem. of Law at 24. For requiring remedial training, it was because a new system was implemented and policies had changed since Plaintiff last worked line duty. Id.; cf. Hiramoto v. Goddard Coll. Corp., 184 F. Supp. 3d 84, 107–08 (D. Vt. 2016), aff'd, 684 F. App'x 48 (2d Cir. 2017) (". . . relative employee qualifications [is] widely recognized as valid, nondiscriminatory bases for any adverse employment decision."). For requiring the sick leave documentation, Defendant points out that Plaintiff had attendance issues. Def.'s Mem. of Law at 25; cf. Hendrics v. Nat'l Cleaning Contractors, Inc., No. 95-CV-5240, 1998 WL 26188, at *3 (S.D.N.Y. Jan. 26, 1998) (recognizing absenteeism as a legitimate, nondiscriminatory reason). For the Zurek directive, Defendant was addressing its staffing needs, a recognized legitimate, nondiscriminatory reason. Def.'s Mem. of Law at 25; Smith v. New York & Presbyterian Hosp., 440 F. Supp. 3d 303, 334 (S.D.N.Y. 2020). For the NOD associated with the vaping incident, it too was to discipline Plaintiff for her misconduct. Def.'s Mem. of Law at 27.

A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons

for its action." <u>Zann Kwan v. Andalex Grp.</u>, 737 F.3d 834, 846 (2d Cir. 2013). But "in order to

infer pretext for a retaliatory motive from multiple justifications, a defendant's nonretaliatory

justifications must be not merely different, but inconsistent with one another." <u>Richardson v.</u>

<u>Bronx Lebanon Hosp.</u>, No. 11-CV-9095, 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014)

(collecting cases); <u>see also</u> <u>Irons v. Bedford–Stuyvesant Cmty. Legal Servs.</u>, No. 13-CV-4467,

2015 WL 5692860, at *30 (E.D.N.Y. Sept. 28, 2015) ("As these varied explanations for

Plaintiffs' selection for termination are not contradictory, this . . . fails to raise a question of fact

as to whether Defendants would not have terminated Plaintiffs but for their retaliatory motives.").

Additionally, "[a]n employer's reason for an adverse action cannot be proven to be a

pretext for retaliation unless it is shown to be false and that retaliation was the real reason."

<u>Hexemer v. Gen. Elec. Co.</u>, No. 12-CV-1808, 2015 WL 3948418, at *9 (N.D.N.Y. June 29,

2015) (Kahn, J.) (citing <u>Quaratino v. Tiffany & Co.</u>, 71 F.3d 58, 64 (2d Cir. 1995)). Moreover,

"[i]n order to succeed on a retaliation claim after a defendant has established a legitimate,

non-discriminatory reason for the adverse action, the plaintiff must present evidence that

retaliation was the 'but-for' cause of the action." <u>Varno v. Canfield</u>, 664 F.App'x. 63, 66 (2d Cir.

2016) (citing <u>Univ of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 133 S.Ct. 2517, 2533, 186

L.Ed.2d 503 (2013)) "'[B]ut-for' causation does not require proof that retaliation was the only

cause of the employer's action, but only that the adverse action would not have occurred in the

absence of the retaliatory motive." <u>Zann Kwan</u>, 737 F.3d at 846.

Here, Plaintiff has failed to present enough evidence to allow a reasonable jury to find

that but for the protected activity (complaining about not receiving service awards), she would

not have experienced any materially adverse actions. Plaintiff has not demonstrated that

Defendant's reasons for the various adverse actions were false, and even if she can, there is no evidence that retaliation was the real reason. In addition to the actions described above, Plaintiff relies on the "prima donna" comment and Captain Zurek's targeting of her. Opp. at 18. Neither is persuasive.

The comment evinces no retaliatory motive. Nothing about the comment suggests that Plaintiff's complaints were a reason for the employment actions, nor does it explicitly mention her complaints. The context of the comment indicates it was related to Plaintiff's removal because of the vestibule incident. Next, even if Captain Zurek targeted her, that alone does not show that she was targeted because of her complaints. In fact, Plaintiff implicitly or explicitly admitted in her response to Defendant's Statement of Material Facts that Captain Zurek did not manage the awards, have input on Plaintiff's awards, review or approve service awards for anyone, nor influence in any way the decision as to whether Plaintiff was eligible for the 20-year service award. Def's SMF ¶¶ 66–68; Pl.'s Resp. to Def's SMF ¶¶ 66–68.[16] At best, Plaintiff can point to the temporal proximity between her complaints and the various actions, but that "alone is insufficient to show [Defendant's] reasons are pretext." Ehrbar v. Forest Hills Hosp., 131 F. Supp. 3d 5, 36 (E.D.N.Y. 2015).

Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's Title VII and ADEA retaliation claims.

## V.    CONCLUSION

Accordingly, it is hereby:

---

[16]   Plaintiff affirmed paragraph 66 and only said that she "can neither affirm nor deny Defendant's Statement of Material Facts" for paragraphs 67 and 68. See supra n.2.

32

**ORDERED**, that Defendant's motion for summary judgment (Dkt. No. 23) is

**GRANTED**; and it is further

**ORDERED**, that the Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:          September 30, 2021
                    Albany, New York

LAWRENCE E. KAHN
United States District Judge

33